In re John Owen MURRIN, III, Debtor.

In re Devonna Kae Murrin, Debtor.

Nos. 09–38182, 09–38183.

United States Bankruptcy Court,
D. Minnesota.

Jan. 4, 2012.

766

Kenneth E. Keate, Tax and Bankruptcy Attorney, P.L.C., Saint Paul, MN, for Debtor.

## MEMORANDUM DECISION ON CONTESTED INVOLUNTARY PETITIONS FOR RELIEF UNDER CHAPTER 7

GREGORY F. KISHEL, Chief Judge.

These cases under Chapter 7 were commenced by involuntary petitions. The Debtors filed answers and contested the petitions. Ultimately, a trial was convened on the petitions; it lasted for two days. Appearances for the petitioning creditors were Peter C. Brehm, for Terri Hanson; Robert M. Smith for Glen Smogoleski; Kevin S. Sandstrom for Toni Klatt; Shawn Shiff for Peder Davisson, Dennis DeSender, and Davisson & Associates, P.A.; Stanford P. Hill for Edina Realty, Inc.; and Patrick J. Neaton for Colleen Turgeon. The Debtors appeared personally and by their attorney, Kenneth E. Keate.

The following memorandum sets forth the disposition of the issues presented, on the evidence received and the arguments of counsel.

## INTRODUCTION

This is another instance where the parties have been at it a long time, at all levels of the Minnesota state courts and now in the federal forum of bankruptcy.

John O. Murrin, III is an attorney at law. At relevant times, he was licensed to practice in the states of Minnesota and California, and other jurisdictions. Early in his career he got considerable attention in the Minneapolis–St. Paul metropolitan area by founding and operating one of the first "legal clinic" operations in Minnesota, holding forth under the trademarked advertising designation of "DIAL L–A–W–Y–E–R–S." More recently, he practiced litigation on the plaintiff's side, in personal injury and other sorts of cases.

In August, 2004, John Murrin and his wife Devonna invested some $600,000.00 in Avidigm Capital Group, Inc. ("Avidigm"). Avidigm was a vehicle for speculation in real estate, at least in part through "foreclosure prevention" activity and trafficking in distressed real estate. For their investment, the Murrins received a promissory note and the promise of security for it.

The Murrins received $187,000.00 in interest payments from Avidigm. However, the operations of Avidigm did not go well in the longer term, and eventually they ceased. In 2007, the Murrins commenced suit in the Hennepin County District Court against Avidigm and 45 other named defendants, individual and corporate. John Murrin represented himself and his wife in commencing the litigation. Later, one Christopher LaNave, a California-based attorney, undertook to represent Devonna Murrin on a pro hac vice basis.

The Murrins had mixed outcomes from the litigation. On the one hand, they extracted settlements from several of the defendants, to the tune of $707,000.00 in total.[1] On the other, they continued to prosecute their litigation against the remaining defendants. Among those remaining opponents were the petitioning creditors for these bankruptcy cases.

Many of the remaining defendants in the state-court litigation professed to have had no more than a lower clerical or administrative capacity in Avidigm or a tangential, contractual relationship with it during its period of operation. Some of them commenced their employment affiliation with Avidigm after the acts through which the Murrins were induced to make their investment. At least some of the ongoing defendants were of very modest employment and financial means.

The litigation proceeded through fits and starts, including three attempts by the Murrins to amend their complaint and multiple other proceedings.[2]

Ultimately, by order dated June 13, 2008, the Hennepin County District Court (D. Reilly, J.) terminated the Murrins' lawsuit adversely to the Murrins, as to all of the remaining defendants.[3] Depending on the defendant and the particular claim, the termination was via dismissal under Minn. R. Civ. P. 12.02(e) (for failure to state a claim on which relief could be granted); via summary judgment under Minn. R.

Civ. P. 56.02; or dismissal under Minn. R. Civ. P. 12.05 and 41.02 (for failure to comply with the pleading requirements of Minn. R. Civ. P. 8.01). The Murrins appealed from the resultant judgment, but they were unsuccessful. *Murrin v. Mosher*, No. A08–1418, 2009 WL 2366119 (Minn. Ct.App. Aug. 4, 2009) (unpubl.), *review denied* (Minn. Oct. 28, 2009). The Minnesota Court of Appeals later granted costs and disbursements to the appellees and against the Murrins.[4]

After the dispositive rulings from the trial court, several of the defendants made motions for imposition of sanctions on the Murrins. Judge Reilly granted those motions, by order dated December 2, 2008. She made individual awards of attorney fees and costs to each movant. In total, the awards came to $431,966.38 in attorney fees and $32,484.86 in costs and disbursements.

The vehicle for this disposition was the HCDC order of 12/8/08, which was 73 pages long. In opening her substantive treatment of the motions, Judge Reilly held and found:

> Plaintiffs ... brought suit against Avidigm and a number of other parties, most of whom have no apparent connection to Plaintiffs' lost investment, including Edina Realty, Ms. Hanson, the Smogoleski Defendants, Ms. Turgeon, Ms. Klatt, and the Davisson and DeSender Defendants. Despite Plaintiffs' volumi-

---

1. On the basis of admissions by one or both of the Murrins, the Hennepin County District Court (Reilly, J.) made specific findings on the amounts of interest received and the amounts paid or to be paid by parties that had settled with the Murrins. *Murrin v. Mosher, et al.*, 27–CV–07–2974 (Minn. State Dist. Ct., 4th Jud. Dist., Dec. 2, 2008), at 7 ("HCDC Order of 12/8/08"). The findings are quoted verbatim, *infra*, at p. 4.

2. The Murrins' litigiousness spilled over into this court, through a dischargeability pro-

ceeding commenced by them against a defendant who had filed for bankruptcy under Chapter 7. That adversary proceeding was dismissed for the Murrins' failure to plead a plausible claim upon which relief could be granted, after two grants of leave to amend. *In re Scott*, 403 B.R. 25 (Bankr.D.Minn.2009).

3. This order will be termed "HCDC order of 6/13/08."

4. This appellate process will be termed "the Murrins' first appeal."

nous submissions to the Court, nearly a year of litigation, and considerable effort on the part of the Court to divine the facts of the case, Plaintiffs have presented no evidence that these moving Defendants are legally responsible for Plaintiffs' claimed loss.

Additionally, Plaintiffs have now been fully compensated for their claims. This lawsuit stems from Plaintiffs' loan of $600,000 to Avidigm on September 1, 2004. By their own admission, Plaintiffs have received, or will soon receive, settlement payments from other Defendants in the aggregate amount of $707,000. [John] Murrin admitted in his deposition that he had recovered settlement payments in the following amounts: $40,000 from Chuck Senn, $57,000 from U.S. Federal Credit Union, $190,000 from Abdo Eick and Meyers, $35,000 from Jason Fischer, and $70,000 from Matthew Mosher. Additionally, Plaintiffs testified in their depositions that they have received seventeen monthly interest payments of $11,000 each, for a total of $187,000. Plaintiffs had been fully compensated for any loss associated with their investment with Avidigm and suffered no damages as of the date of the Court's Order dismissing the case.

HCDC order of 12/8/08, at 7. On December 23, 2008, judgments were entered on the awards of attorney fees.[5] After that, on motion of Edina Realty, Inc. and the Davisson/DeSender parties, the Hennepin County District Court adjudicated the Murrins in contempt in connection with post-judgment collection procedures begun by those movants. The Murrins appealed from the judgments and the contempt adjudications. All of these appellate proceedings were consolidated by the Minnesota Court of Appeals.[6]

While that appeal was pending, four of the recipients of the awards of attorney fees joined and filed involuntary petitions under 11 U.S.C. § 303 against the Murrins, for relief under Chapter 7. The petitions were styled separately and two cases were opened by the clerk. After that, several other state-court defendants joined the involuntary petitions in both cases.[7]

The resort to involuntary bankruptcy in the mid-stages of an appellate process in the state courts was questioned from the bench early in these cases. The response from the petitioning creditors was that an investigation had revealed that John Murrin had transferred several hundred thousand dollars to his aged mother in late 2008 and that the availability of a key bankruptcy remedy—avoidance of a transfer to an insider—might otherwise have been lost, had the involuntary petition been deferred even a few months.

The Murrins' response to the involuntary petitions was a motion to dismiss, e-filed by their bankruptcy attorney a few hours before relief would have been ordered by default. The Murrins raised two issues via the motion: lack of standing in the petitioning creditors, i.e., a bona fide dispute over the Murrins' liability to the petitioning creditors, 11 U.S.C. § 303(b)(1); and improper venue of these cases, 28 U.S.C. § 1408(1). The Murrins requested an award of punitive damages and attorney fees on the ground of bad

---

**5.** The judgments contain the most-accessible breakdown of the individual awards to the recipients. The document is in evidence as Petitioning Creditors' Exh. 2.

**6.** This appellate process will be termed "the Murrins' second appeal."

**7.** As stipulated, the initially-filing petitioning creditors were Terri Hanson, Colleen Turgeon, Glenn Smogoleski, and Robin Smogoleski; the later-joined petitioning creditors were Toni Klatt, Peder Davisson, Davisson & Associates, P.A., Dennis DeSender, and Edina Realty, Inc.

faith on the part of the petitioning creditors.

At the first hearing on that motion, the parties stipulated to a grant of relief from stay to allow the proceedings in the Minnesota Court of Appeals to go forward. The Court determined that multiple fact issues were implicated by the theories of the Murrins' motion, and ordered an evidentiary hearing after opportunity for discovery. Ultimately, proceedings on the Murrins' motion were rolled into the proceedings on the petitions themselves. The Murrins' answers to the involuntary petitions queued up a third issue, the propriety of ordering relief, i.e., whether the Murrins were "generally not paying [their] debts as they became due," 11 U.S.C. § 303(h)(1).

The evidentiary hearing was continued once on stipulation and once on the parties' acquiescence, to permit the Murrins to place new issues before the Court.[8] The Court acquiesced to that without enthusiasm. It was also the thought of the parties that certain issues might be narrowed or resolved when the Minnesota Court of Appeals issued its decision. All parties recognized that awaiting the outcome of a petition to review the decision of the Court of Appeals could further delay this matter, but they professed to be okay with that. Expressly recognizing the tension with Fed. R. Bankr.P. 1013, the Court again acquiesced to carry over this matter if that happened—out of the hope that a firm result in the state appellate process would directly bear on the issue under § 303(b)(1), if nothing else.

The Minnesota Court of Appeals issued its opinion, affirming the Hennepin County District Court as to the imposition of sanctions on John Murrin but reversing as to Devonna Murrin. The Minnesota Supreme Court denied a petition for review. *Murrin v. Mosher,* No. A09–314, 2010 WL 1029306 (Minn.Ct.App. Mar. 23, 2010) (unpubl.), *review denied* (Minn. Aug. 10, 2010). So, finally, all articulated reasons for deferring the submission of the involuntary petitions were exhausted. A status conference was held; the evidentiary hearing was scheduled; and pretrial submissions were ordered. Two days' worth of evidence was received on the three issues presented.

## JURISDICTION AND JUDICIAL AUTHORITY

The issue on an involuntary petition under 11 U.S.C. § 303(a) that is contested pursuant to 11 U.S.C. § 303(h) is whether relief under the Bankruptcy Code should be ordered as to the debtor named in the petition. The filing of an involuntary petition under Chapter 7 commences a case under the Bankruptcy Code (title 11 of the United States Code). 11 U.S.C. § 303(b). That case is within the district court's jurisdiction, 28 U.S.C. § 1334(a); the contested petition is a "civil proceeding under title 11" within the district court's jurisdiction, 28 U.S.C. § 1334(b); as such it is before a bankruptcy judge by reference from the district court, 28 U.S.C. § 157(a) and Loc. R. Bankr. P. (D. Minn.) 1070–1; and as a fundamental "proceeding affecting ... the adjustment of the debtor-creditor relationship," a contested involuntary petition is subject to the entry of final order at the direction of a bankruptcy judge, 28 U.S.C. § 157(b)(2)(O).[9]

---

**8.** The Murrins' counsel was granted an opportunity to file a motion for abstention pursuant to 11 U.S.C. § 305(g), on specific conditions to ensure that it came on promptly but with a full period of notice to his clients' opponents. Counsel failed to comply with those conditions, and the motion was filed untimely. Acting *sua sponte,* the court denied the motion for abstention with prejudice [Dkt. No. 42]. The Murrins also moved that the petitioning creditors be required to post a bond, and that motion was denied.

**9.** An order for relief on a contested involuntary petition is a final order. *In re McGinnis,*

## THE ISSUES, AND THEIR RESOLUTION[10]

The treatment of the three issues follows, in the logical order. Each issue must be treated separately as to each of the Murrins, since the disposition of the attorney-fee judgment in the Minnesota Court of Appeals left them differently-situated as to their ultimate liabilities to the petitioning creditors.

1. *Petitioning Creditors' Standing to Seek Bankruptcy Relief Against the Debtors: 11 U.S.C. § 303(b)(1).*

An involuntary bankruptcy petition may be filed:

> ... by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount, ... if such noncontingent, undisputed claims aggregate at least $14,425 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims; ...

11 U.S.C. § 303(b)(1). The petitions that commenced these cases were subscribed by three creditors each (namely, Terri Hanson, Colleen Turgeon, and Glenn Smogoleski). There is no dispute as to the requirements set by the last clause of the statute, i.e., the unsecured status of the claims held by the petitioning creditors,[11] or an undersecured status for their claims to the prescribed degree of value. The Murrins' contention as to this requirement is that the petitioning creditors' claims were subject to bona fide dispute, because the Murrins' second appeal was pending when the involuntary petitions were filed.

▮▮▮ The requirement of lack of a bona fide dispute over petitioning creditors' claims is a measure to ensure that involuntary bankruptcy is not used to short-circuit valid litigation on genuinely-contested claims, by subjecting a resistant opponent to the hobble of liquidation through federal insolvency processes. *See* 30 CONG. REC. S7618 (June 19, 1984) (comments of Senator Baucus, as to 1984 amendment of § 303 that enacted requirement that petitioning creditor's claim not be subject to bona fide dispute).[12] The term "bona fide dispute" is not defined in the Bankruptcy Code. However, the Eighth Circuit uses an objective standard for determining "whether a bona fide dispute exists" under § 303(b)(1). *In re Rimell*, 946 F.2d 1363, 1365 (8th Cir.1991).[13]

---

296 F.3d 730, 731 (8th Cir.2002); *In re Young*, 336 B.R. 775, 777 (8th Cir. BAP 2006).

**10.** The discussion in this section will include separate findings of fact divided by each component issue, and the legal analysis on the particular sets of facts.

**11.** For all further analysis, the phrase "petitioning creditors" will denote the original three petitioners plus all creditors who ultimately joined the petition (i.e., the three noted in the text above, plus Toni Klatt, Peder K. Davisson, Davisson & Associates, P.A., Dennis L. DeSender, and Edina Realty, Inc.).

**12.** *Cf. In re Nordbrock*, 772 F.2d 397, 400 (8th Cir.1985) (applying § 303(b)(1); but observing generally that "[a] creditor does not have a specific need for bankruptcy relief if it can go to state court to collect a debt"); *Basin Elec. Power Co-op. v. Midwest Proc. Co.*, 769 F.2d 483, 487 (8th Cir.1985), *cert. denied*, 474 U.S. 1083, 106 S.Ct. 854, 88 L.Ed.2d 894 (1986) (applying three-creditor requirement of § 303(b)(1); recognizing danger of unscrupulous creditor using involuntary bankruptcy "to attain an advantageous position" as to subject of its legal dispute with putative debtor).

**13.** Before the enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. 109-8, a "bona fide dispute" cognizable under § 303(b)(1) would go only to the putative debtor's "liability," i.e., a dispute as to the "validity of the debt." *In re Rimell*, 946 F.2d at 1365 (quoting *Matter of Busick*, 831 F.2d 745, 750 (7th Cir.1987)). In BAPCPA, Congress added the words "or

Under this standard, "a bona fide dispute exists if there are 'substantial' factual and legal questions raised by the debtor bearing upon the debtor's liability." *Id.*[14] The correlate, of course, is that a debtor's subjective contentions alone do not dictate the existence of a bona fide dispute; there must be "an *objective basis* for either a factual or a legal dispute as to ... the debt." *Id.* (quoting *Busick*, 831 F.2d at 750; emphasis added and interior quotes omitted).

■ *Rimell* sets up a "burden shifting analysis for determining the existence of a bona fide dispute," by adopting the approach of the Seventh Circuit in *Busick*, 831 F.2d at 749–750. *In re McGinnis*, 296 F.3d 730, 731 (8th Cir.2002). First, the petitioning creditor(s) must allege and produce evidence that the claim is not subject to bona fide dispute. That shifts the burden to the putative debtor, "to present evidence demonstrating that a bona fide dispute does exist." *In re Rimell*, 946 F.2d at 1365. In the Eighth Circuit's view, this analysis best effectuates the congressional intent behind the requirement of no bona fide dispute. *Id.*

■■ The existence of a bona fide dispute is an issue of fact in the first instance. *In re McGinnis*, 296 F.3d at 731; *In re Rimell*, 946 F.2d at 1365. But, where a putative debtor's liability to a petitioning creditor has been reduced to judgment in a nonbankruptcy forum court, and the judgment has not been stayed, the issue need not turn on a comparison of *evidence* on the merits of the underlying claim; after

all, a court's judicial action has already settled the facts and law outside the bankruptcy arena. Rather, the analysis goes to the judgment itself.

Where a putative debtor refuses to defer to the pre-petition adjudication, the courts have developed two approaches to the treatment of a debt-evidencing judgment under 11 U.S.C. § 303(b)(1). Under the majority view, the existence of an unstayed judgment alone is unrebuttable proof that a petitioning creditor's claim is not subject to bona fide dispute. *E.g., In re Concrete Pumping Serv., Inc.*, 943 F.2d 627, 629 (6th Cir.1991); *In re Euro–Am. Lodging Corp.*, 357 B.R. 700, 712–713 (Bankr. S.D.N.Y.2007); *In re Everett*, 178 B.R. 132, 140 (Bankr.N.D.Ohio 1994); *In re Drexler*, 56 B.R. 960, 967–969 (Bankr. S.D.N.Y.1986). There is a minority-view line of cases that might deny the status of undisputed claims reduced to judgment, if there is a pending appeal or other proceeding for relief from the judgment. Most of the pronouncements in this line come out of judgments entered by default or by inadvertence, and not on the merits. *In re Graber*, 319 B.R. 374, 377–378 (Bankr.E.D.Pa.2004); *In re Henry S. Miller Comm'l, LLC*, 418 B.R. at 921; *In re Prisuta*, 121 B.R. 474, 476–477 (Bankr. W.D.Pa.1990). At the extreme end of the minority view, a judgment rendered on the merits is not to be considered undisputed if it is on appeal or otherwise challenged by a putative debtor, and the basis for that challenge is to be examined for good faith

---

amount" to the phrase "the subject of a bona fide dispute as to liability." Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. 109–8, Title III, Sec. 1234(a)(1)(A), 119 Stat. 204 (Apr. 20, 2005). It has been recognized since that this two-word addition did not alter the standard for determining the *existence* of a bona fide dispute; rather, a "bona fide dispute" now may be recognized on account of either the

amount or the liability on a petitioning creditor's claim. *In re Henry S. Miller Comm'l, LLC*, 418 B.R. 912, 927 (Bankr.N.D.Tex. 2009).

**14.** *Rimell* was decided before BAPCPA; so now, obviously, the " 'substantial' factual and legal questions" could also go to the amount of a petitioning creditor's claim against a resistant debtor.

and substantive merit. *In re Byrd,* 357 F.3d 433, 438–439 (4th Cir.2004).[15]

The Eighth Circuit has not spoken to this issue, so there is no binding precedent to apply.

The Murrins sharply contested the petitioning creditors' satisfaction of this requirement, arguing that it was a matter of both law and fact.[16] But in the end, under the better rule of decision, measured as of the date when the petitions were filed for these cases,[17] there were claims held by the petitioning creditors against both of the Murrins, that were not subject to bona fide dispute, as to liability or amount.

In the Hennepin County District Court, the petitioning creditors' requests for sanctions had been minutely examined by the presiding judge, as to the full course of the Murrins' litigation. They had been exhaustively treated in a long written decision. The resulting debts had been liquidated by a specific quantification as the law required for awards of attorney fees and costs. The same was done for the awards made on the post-judgment contempt adjudications by the successor-

judge.[18] Liability and amount as to both types of awards had been fully vetted through long adversarial procedures, in which both sides had been tenacious. Both of the Murrins had had their full due process before the liability was imposed and liquidated.

Under the majority rule and the more centrist approach of the minority rule, that would be enough. The pendency of the Murrins' appeals would have no bearing at all on the issue of a bona fide dispute, because the Murrins were unsuccessful in their bid to get a stay pending appeal.[19] But were the minority rule applied, and even under its extreme form, neither the contemporaneous substance of their appeals nor its ensuing, actual outcome make out the bona fide dispute that could be deemed as to the existence and amount of a separate liability to the petitioning creditors by each of the Murrins, adjudicated and unsatisfied when these cases were commenced. The reasons are as follows.

■ *As to John Murrin,* the propriety of the original imposition of sanctions was utterly patent when it was made. Judge

---

**15.** This minority-view variant is the most deferential to the putative debtor. Nonetheless, it is still founded on the idea that the putative debtor's subjective dissatisfaction cannot create a bona fide dispute, in itself—even if the contentions have been put in motion formally via appeal or other court procedure.

**16.** Pitching for the adoption of *Byrd's* rationale, the Murrins' counsel proposed to offer the testimony of one Randall Tigue, Esq., as an expert witness on the alleged merit of the Murrins' appeal. The petitioning creditors objected to the proffer on the ground that the Murrins' counsel had not complied with any of the disclosure requirements of Fed.R.Civ.P. 26(a)(2), *as incorporated by* Fed. R. Bankr.P. 9014(c). That objection was sustained. The Court did not have to reach the issue of whether expert testimony on the legal merit of a pending appeal was even relevant in a court trial; but there certainly are cogent arguments that it is not.

**17.** *Boston Beverage Corp. v. Turner,* 81 B.R. 738, 745 (Bankr.D.Mass.1987).

**18.** When the post-judgment proceedings were conducted, the assigned judge of the Hennepin County District Court, Denise Reilly, was serving on the panel that was hearing the trial on the Coleman–Franken senatorial election dispute. Another judge of the same court was assigned to the post-judgment matters, in her absence.

**19.** The Murrins could not obtain a supersedeas bond in the required amount. One decisive reason for the bonding company's refusal was a lack of adequate security. That lack was caused in large part by John Murrin's transfer of $385,000.00 to his aged mother after the entry of judgment. It does come around.

Reilly repeatedly noted how John Murrin's pleading against all of the defendants who are now petitioning creditors was fatally deficient in itself, despite successive amendments. John Murrin simply never mustered a recitation of on-point facts to make out a plausible claim for fraud in the inducement, or on any of his multiple alternate pleaded legal theories against the specific individuals and entities. HCDC Order of 6/13/08, at 8, 11–13, 15, and 17; HCDC Order of 12/8/08, at 10–13 and 16.[20] Nor was he able to point to any evidence of their participation as individuals in the huge "scheme" that his vague theory of liability envisioned. HCDC Order of 12/8/08, at 10, n. 9. Rather, as he virtually admitted to Judge Reilly, he had sued everybody and everything he could identify to Avidigm's operation over a long period of time that he had defined himself. He did this in the hope that post-suit discovery would generate evidence to link all of them in some way to an infliction of injury on the Murrins, no matter how attenuated their relationships to Avidigm.[21] Ultimately, far too much of his asserted right to root around in discovery was based on a shallow and conclusory theory of "conspiracy" among nearly four dozen named defendants, and nothing more. And, the duration of this alleged cabal was much broader than any that was logically identifiable to a defined process of inducement to make an investment, the transaction that was key to his theory of suit.

This was the conduct Judge Reilly confronted, engaged in by a licensed and long-experienced attorney who had commenced suit on behalf of himself and his spouse without the leavening, more distanced counsel of an independent attorney. From the present vantage point, John Murrin's acts were a valid platform for an award of sanctions, the imposition of which was fully justifiable after it was established that the Murrins had not had the necessary fruits of a pre-suit investigation of fact, HCDC Order of 12/8/08, at 51–52, to tie the petitioning creditors as active tortfeasors into John Murrin's rambling narrative of chicanery.

The request for sanctions was given real punch by John Murrin's relentless pursuit of persons and entities that had never been more than outliers to Avidigm's operation, after he had consummated settlements with other defendants. The Murrins had been more than made whole, but persisted in maintaining suit against the remaining defendants without the basis for an objectively-framed prima facie case against them.[22] This gave every reason for an award under Rule 11, under the provisions to redress harassment and unnecessary delay that Judge Reilly invoked: the continued pursuit of modestly-situated opponents named as defendants without a concrete basis in fact for deeming them culpable—and after any plaintiff-litigant with more normal incentives of cost-saving would have been content with the receipt

20. This was despite a fourth proposal for a complaint that was 272 pages long, contained 132 counts, and had 1,668 numbered paragraphs against 43 named defendants; and a fifth proposal that pared it back to 165 pages, 64 counts, and 945 paragraphs. HCDC Order of 6/13/08, at 7.

21. John Murrin also admitted this to the undersigned as to another defendant, Clichelle Scott, during a hearing in the adversary proceeding described in n.2, *supra*.

22. Judge Reilly put it quite pointedly:

> ... the Court can only deduce [the Murrins] were attempting to obtain cash settlements from as many Defendants as possible, viewing their loss through Avidigm as an opportunity to make a windfall profit out of innocent parties.... It appears [the Murrins] sought to make a profit from multiple settlements rather than recoup the initial $600,000 outlay.

HCDC Order of 12/8/08, at 52.

of a recovery already markedly in excess of his initial investment.[23]

Under the meaning of bankruptcy law, i.e., from an objective view, John Murrin harbored no good faith in his challenge to the original judgment for attorney fees. The decisions of the Minnesota appellate courts vindicated the Hennepin County District Court judgment against him, and they did so with certainty. The lack of merit to his pleaded claims against the petitioning creditors was that patent. And because John Murrin's liability on an unstayed judgment was so clear cut, he could have no bona fide dispute with the contempt sanctions later imposed on him as a consequence of his unexcused and unfounded resistance to the post-judgment collection process.

So, whether one applies the majority or the minority rule on the nature of a bona fide dispute under § 303(b)(1), the petitioning creditors did not lack standing under that provision to file their petition against John Murrin.

■ *As to Devonna Murrin,* the parties had the same posture on the date of the involuntary filings. Devonna Murrin's debts to the petitioning creditors had been fixed and liquidated judicially, via the same orders and judgments that imposed like liabilities on her husband. On the Murrins' appeal, however, a difference arose:

the reversal outright of the attorney-fee award and the contempt adjudication and sanctions imposed on Devonna Murrin. This requires a closer analysis under § 303(b)(1).

As to the case against John Murrin, it was not necessary to choose among the three variant constructions of "bona fide dispute" under extant case law, as applied to a judgment in process of appeal. The circumstances of his liability under the award met all of the standards, including the one under *Byrd* that was most deferential to an appellant/putative debtor. As to Devonna Murrin, however, it is necessary to make one choice, whether to adopt *Byrd's* rationale as the Murrins urge. Were that done, her success on appeal might require her contentions there to be deemed a bona fide dispute under § 303(b)(1).

*Byrd,* however, is not tenable in context. Its potential deference to the "merits" of a putative debtor's appellate case undercuts the basic rationale that the deference purports to qualify. An unsatisfied judgment is enforceable absent a stay, constituting as it does a resolution at the trial court level of the disputes previously put into suit. Particularly when a judgment has been rendered on the merits, its enforceability should be given comity by a federal court that is required to determine wheth-

---

**23.** In his testimony before this court, John Murrin insisted that he had had to keep going to recoup "hundreds of thousands of dollars" in attorney fees and litigation costs that the Murrins had incurred, even though they had recovered cash in more than the base amount of their original loss. He was not asked to expand on this. As it stands, the statement is almost squalid in its presumption. First, John Murrin was the attorney doing most of the work; so there was no out-of-pocket expenditure for his legal services. He has never cited a basis for imputing charges for his time back to himself, as a recoverable element for an award of damages or costs under any theory. Second, he was left with a group of

defendants who had been mostly small fish in Avidigm's operation and structure. Probably, no more than a few of the remaining defendant-entities could have responded to a judgment for attorney fees and costs. Third, John Murrin had pleaded only a small number of statutory claims on which attorney fees and costs were expressly capable of award. (The inevitable but slackly-pleaded claim based on the Racketeer Influenced and Corrupt Organizations Act was the most obvious.) Recovery of attorney fees and costs against the remaining individual defendants would have required proof of their direct culpability or a conspirator status—which the Murrins simply did not have.

er bankruptcy relief should be had against the judgment debtor. *Cf. In re Skyline Woods Country Club,* 636 F.3d 467, 470 (8th Cir.2011) (holding that a Nebraska state-court judgment was not subject to collateral attack in a bankruptcy court because the "interests of finality and comity preclude a collateral attack on the first court's decision ... even if incorrect.").[24]

Once *Byrd* is rejected, it is not necessary to choose between the irrebuttable presumption under the majority rule, or the rebuttable one that is defused where a judgment debtor might be relieved of the judgment because it was not the result of a true contest presented to the issuing court on its factual and legal merits. Devonna Murrin had the ample benefit of the adversary process, aggressively represented by her husband and LaNave in succession in resisting the motion before the Hennepin County District Court for imposition of sanctions and the ensuing contempt proceedings. When the involuntary bankruptcy petition against her was filed, Devonna Murrin was a debtor to the petitioning creditors, in a collective total of nearly half a million dollars, evidenced by an enforceable judgment on the merits.

■ However, even were *Byrd's* rule applied, and Devonna Murrin's success on

appeal recognized as evidence of a bona fide dispute over her liability on litigation sanctions, the outcome under § 303(b)(1) is the same. Devonna Murrin was still a debtor to the petitioning creditors under a separate decision of the Minnesota state courts: the awards of costs and disbursements made on December 21, 2009 to the petitioning creditors after the Murrins' first appeal was terminated on its merits.[25] During the earlier stages of these cases, the Murrins dithered about whether there was surviving liability in one or both of them on those debts, or on other sanctions imposed in the state court litigation. It got entirely too confusing, not the least because John Murrin's shifting, obstructive, repetitive tactics had multiplied proceedings vexatiously. *He* had made it far too complicated for anyone to easily segregate out references to parallel proceedings and awards at the various levels of the Minnesota courts. But in the end, the liability that Devonna Murrin had had on the award of costs and disbursements from the Murrins' first appeal was established by admission to this court, when the first day of the evidentiary hearing began.[26] That liability was not subject to bona fide dispute, when the petition against Devonna Murrin was filed; it was substantial

24. For that matter, the Full Faith and Credit Act, 28 U.S.C. § 1738, seems to speak to the issue even more pointedly than the federalism-generated judicial policy of comity; and it too drives toward deference to the state-court decision as long as it is enforceable in its original forum.

25. The Murrins stipulated to the occurrence and characteristics of this award.

26. As soon as the hearing was called on its first day, the Murrins' attorney made a large show of announcing that John Murrin's mother had advanced funds three days earlier, to enable the Murrins to pay off the awards of costs and disbursements, and that the monies had been tendered to the petitioning credi-

tors' counsel. Coming when and as it did, this was an obnoxious ploy; it was clearly intended to promote further evasion and disruption. The petitioning creditors' counsel were struggling with what to do with the tendered checks, and not unreasonably so; it was money for their long-frustrated clients, of course, but it all smelled of a trap. They objected to the tender being given any substantive effect on issues long- and hard-litigated and finally ready for submission. Even had they not done so, the tactic is not to be given any credit. A post-petition payment on a pre-petition debt does not alter the debt's status as a "claim," as it stood when the bankruptcy case was commenced, when the status as of that date is material to an issue in the case.

enough, and it was unsatisfied in its entirety and long due as of that date.

So, whatever the construction for the existence of a bona fide dispute under § 303(b)(1), the petitioning creditors established that they held unsatisfied claims against both of the Murrins, duly court-adjudicated and hence not subject to bona fide dispute, when the petitions were filed to start these cases.[27] The bankruptcy court's jurisdiction was properly invoked by the requisite number of petitioning creditors with standing.

### 2. Grounds for Ordering Relief in Bankruptcy Against the Debtors: 11 U.S.C. § 303(h)(1).

 Once an involuntary petition is contested by the party against which it is filed,

... after trial, the court shall order relief against the debtor in an involuntary case under the chapter under which the petition was filed, only if—

(1) the debtor is generally not paying such debtor's debts as such debts become due unless such debts are the subject of a bona fide dispute as to liability or amount ...

11 U.S.C. § 303(h)(1). In a connotative sense, this is something close to a requirement of "operational insolvency," to merit the application of bankruptcy's comprehensive remedies to redress creditors in a case not voluntarily commenced by the debtor. In this statute's contemplation, the financial failure is evidenced by a putative debtor's persisting default on obligations to pay debts as due, "generally." The Murrins strenuously resisted the petitioning creditors on this requirement, focusing on the qualifying adverb "generally."

Their argument is that they were not untimely in payment on any of the debts of their household, or of their business activity in Duluth (the ownership and rental of multiple different residential properties in the Woodland and Kenwood neighborhoods), at any time material to the involuntary petitions. The thrust of the argument is that their personal debt structure is predominated by consensual obligations other than their debts to the petitioning creditors, hence making them not "generally" in default. There is an insinuation that their debt to the petitioning creditors, coming out of litigation as it did, is an anomaly—a sport that should not be factored into the analysis under § 303(h)(1) anyway.

This argument on this very requirement has been addressed by an appellate forum within the Eighth Circuit, on a history and posture of parties that is strikingly similar to the one at bar. In re Feinberg, 238 B.R. 781 (8th Cir. BAP 1999).[28] In Fein-

---

**27.** This outcome on this issue jibes with that in one of the earliest appellate decisions under the Bankruptcy Code of 1978 from the U.S. District Court for this district. In re Hill, 8 B.R. 779, 781 (D.Minn.1981) (for purposes of involuntary petition there, "[w]hile the Cargill debt is the subject of an appeal, it clearly constitutes a claim in the bankruptcy sense."). One hesitates to make much more of Hill for this issue because the observation seemed to be dictum, and broadly-worded dictum rendered before any development of appellate nuance under a new statutory provision. However, the threshold thought is very much of a piece with the later cases.

**28.** The Westlaw-disseminated "Direct History" for the Feinberg opinion contains the cryptic notation: "Judgment Vacated (Dec 16, 1999)." There is nothing else to expand on this, in the e-format or hard-copy publications of the opinion. There is no indication in those publications that the Bankruptcy Appellate Panel ever withdrew its opinion, in the sense of disavowing its analysis and removing it from the public forum of legal theory. So, Feinberg is cited here as an indication of how one intermediate appellate forum would address the issue at bar, or at least how it did address it once; and because the logic of Feinberg is straightforward and reasonable it is being deferred to now. Since decisions of the B.A.P. are not precedential, it is not nec-

*berg,* the putative debtor was a dentist who was a judgment debtor to his seven former partners in a professional practice, through lawsuits sounding in fraud, breach of contract, and breach of fiduciary duty. Liability under the several judgments totaled $2.3 million dollars, and the putative debtor "may have actively hindered efforts to collect the debt"; but it was undisputed that "he and his wife timely [paid] all other debts and bills as they [came] due." 238 B.R. at 783.

So, putative debtor Feinberg defended the petitions on the substantive requirement of § 303(h)(1). After noting that there were "no standard rules for determining the concept of generally not paying," the B.A.P. identified "several factors which should be viewed in light of the alleged debtor's total financial picture":

(1) the number of unpaid claims;

(2) the amount of the claims;

(3) the materiality of nonpayment; and

(4) the overall conduct of the debtor's financial affairs.

*Id.*

Happily, the opinion in *Feinberg* avoids the tiresome judicial convention of matching previously-recited facts anew and indi-

vidually to a factor-by-factor analysis. However, there is no doubt that it had in mind the persistently unpaid status of seven separate and large judgments, when it observed that

> [t]he record ... is replete with debtor's actions in manipulating his and his wife's income, transferring assets, attempting to hinder and delay these creditors, while living lavishly. These facts ... clearly mandates [sic] a finding that there is a general failure to pay debts as they come due.

238 B.R. at 784–785. Thus, the *Feinberg* panel reversed the bankruptcy court—which had declined to order relief against the putative debtor and had dismissed the petition—and remanded for an application of the factor-based analysis that it was bringing into local bankruptcy jurisprudence for the first time.[29]

Much of the discussion in *Feinberg* went off on an issue not even addressed in the bankruptcy court, and perhaps raised *sua sponte* by the B.A.P.[30] The panel clearly considered § 303(h)(1) to be dispositive of the issue presented for appellate review, i.e., whether the bankruptcy court's denial of relief and dismissal of the petition

essary to delve further to determine whether that forum still claims *Feinberg* as its own.

**29.** It further directed the bankruptcy court to address the debtor's motion for abstention under 11 U.S.C. § 305, "should [it], upon analysis of the relevant facts and factors, determine that entry of an order for relief is merited...." 238 B.R. at 785. *Feinberg* also contains a pronouncement that "[t]he mere fact that a judgment has been appealed does not create a *bona fide* dispute for purposes of" § 303(h)(1). 238 B.R. at 783. (There is no indication in the opinion that an appeal from the predicate judgment was pending there.)

**30.** This was whether a "single creditor rule" should be adopted and applied—"under which courts are purportedly disinclined to permit an involuntary petition where there is

only a single creditor." 238 B.R. at 783 and n. 4. The B.A.P.'s concern over a "single creditor rule" may have been an extension of an observation made by the Eighth Circuit in *In re Nordbrock,* 772 F.2d at 399–400, and this discussion may have been prompted by the notion that the seven judgment creditors' common alignment made them the functional equivalent of one creditor. However, after string-citing through an analysis on this non-issue, including a "special circumstances" qualification imposed by some courts, the *Feinberg* panel seemed to reject the "rule." It pronounced that the bankruptcy court would not have been required to "invoke the single creditor rule" anyway, given the "inconsistency of the rule with the statutory language." 238 B.R. at 784. (It is not clear where this left the application of the circuit court's earlier statement in *Nordbrock.*)

should stand. And, under *Feinberg's* reasoning, the same conclusion of law has to be made—on facts at bar that barely differ from those that compelled an order for relief in *Feinberg*:

1. When the petitions here were filed, both of the Murrins were judgment debtors to the petitioning creditors. The attorney fee awards in the first round of judgments were substantial in amount, whether considered individually or in total. The awards on the contempt sanctions were not of the same magnitude, but had the same legal gravity insofar as their origin was concerned. The same conclusion applies to the awards of costs and disbursements on the Murrins' first appeal. Though they were ordered shortly after these cases were commenced, they related directly and automatically back to the pre-petition appellate outcome that was adverse to the Murrins, as a legal entitlement under applicable rule.

2. None of these liabilities had been paid in any appreciable amount by the date of the involuntary petitions. A couple of the petitioning creditors had received small payments on the sanctions awards, but those had been extracted involuntarily-by judgment collection procedures that the Murrins had actively and passively resisted.

3. The first two sets of liabilities had been imposed on the Murrins by judicial action, on findings that they both had engaged in culpable and wrongful conduct that merited recompense to their opponents, the petitioning creditors.

4. Just weeks after the initial and larger liability for attorney fees had been imposed on them, the Murrins had engineered the transfer of liquid funds, directly by their own acts or indirectly through instruction to third-party obligors to the Murrins. First, the Murrins gave $385,000.00 to John Murrin's mother in California, who was then over 80 years old. This was ostensibly in repayment of a debt that was decades old, going back to the earlier years of John Murrin's law practice in the 1970s and 1980s. The debt was not evidenced by a promissory note or other writing.[31] John Murrin admitted in this court that he had made this massive payment because he believed his mother was a "more just" creditor than the petitioning creditors and "had priority absolutely" over them. Devonna Murrin admitted all this had been done, to "keep the money out of [the petitioning creditors'] hands," "until the appeal was over."[32] On the very day that he transferred the money to his mother, John Murrin failed to disclose that act in an affidavit he submitted to the Hennepin County District Court to try to justify the refusal of sureties to issue a supersedeas bond to him. After that, but before the involuntary petitions were filed, the Murrins instructed tenants of

---

**31.** *Before this court, John Murrin admitted that he had never scheduled the debt to his mother on any financial statement he had given to a third-party institutional lender. He omitted any mention because he had "wanted [his] financial statement to look as good as possible."*

**32.** One of the areas of legal practice purveyed by John Murrin's legal clinic three decades ago was consumer bankruptcy, for debtors. On gaining even the most rudimentary conversance with bankruptcy law, any lawyer would have been aware of the nature of preferential and fraudulent transfers.

their rental properties in Duluth to make their monthly payments directly to mortgagees, or to another business entity owned by the Murrins that had never been involved in the Duluth rental-properties undertaking. For a time, the Murrins "ran 100%" of their personal expenditures through a bank account for one of their business entities. They did all this after counsel for one or more of the petitioning creditors started proceedings to garnish or attach the rents, in collection on the judgments for attorney fees. John Murrin also admitted to "operating on a cash basis" as to other revenue-generating real estate investments after the petitioning creditors received their sanctions judgments, i.e., terminating direct-deposit arrangements for tenant rent payments, asking for payment in the form of "cash checks," and then negotiating such instruments quickly to get "green cash in [my] hands." As to such measures, he pointedly admitted "I am subject to levy and execution now so I like to keep it protected" from the petitioning creditors' collection measures. Devonna Murrin admitted to making frequent and many transfers of money among personal and business-entity bank accounts, toward the same end. Finally, in one of the orders entered in the post-judgment collection procedures that the Murrins resisted, the Hennepin

County District Court (Porter, J.) noted the Murrins' "irrational and defiant refusal to provide even a good-faith, partial substantive response to ... post-justment discovery requests," was "clear proof of bad faith." This, per Judge Porter, "raised a reasonable suspicion that [the Murrins were] stalling the Court in order to hide assets and thus avoid paying the judgment." [33] Soon after that, a bench warrant for John Murrin's arrest was issued, for his failure to appear for deposition as ordered. After the failure of his ensuing ploy to obtain a writ of mandamus against the Hennepin County District Court, John Murrin did finally appear—three months after originally ordered. This all occurred only after John Murrin ("very concerned" and "not want[ing] to be arrested") retained an independent attorney not previously involved with the Avidigm litigation, and she advised him that he "must disclose everything" in the post-judgment process. Even then, the Murrins continued to be resistant and confrontive and had to supplement responses after "remember[ing] more information." [34]

On facts that are not materially distinguishable, that in some respects are less egregious than the ones at bar, the B.A.P. held in *Feinberg* that "error occurred" in the bankruptcy court's finding that the

33. This order entered on March 6, 2009 is in evidence as Petitioning Creditors' Exh. 4.

34. That lawyer, Dawn Weber, Esq., was a careful, cooperative, and forthcoming witness before this court. She testified on cross-examination that the Murrins had never disclosed to her that they had transferred funds among bank accounts to the extent they had; that they had had Duluth tenants make rent payments via VISA to three different business entities of theirs; or that they had moved the $385,000.00 from Minnesota-based bank accounts to business-related bank accounts in California, before directing the funds to John Murrin's mother's account. She testified, somewhat gingerly, that "if they [had been] truthful, [she] assume[d] that they would have told this to [her]."

putative debtor there was not "generally paying such debtor's debts as they [became] due":

> The amount of the delinquency to the petitioning creditors is very large, and the debtor pays those debts he considers he should pay, rather than all just debts and thus cannot be said to be paying his debts or general obligations as they come due.

238 B.R. at 784. And, in a more general sense, *Feinberg's* holding was resonant with the ruling in *In re Hill,* 8 B.R. at 780–781 (on "a straightforward reading" of § 303(h)(1), holding that debtors who had not satisfied three judgments on individual guaranties of corporate debt were "generally not paying such debtor's debts as such debts become due," despite their currency in payment on household and personal debt).

The Murrins acknowledge that they have resisted giving any meaningful financial satisfaction to the petitioning creditors. However, they insist that their asserted currency on the debt related to their household and their investments should preponderate over that, for the purposes of § 303(h)(1). Even if the latter

were true—and there is appreciable evidence that it is not [35]—it would not matter under *Feinberg.* In the bankruptcy sense or not, the Murrins' debts to the petitioning creditors are as "just" as their debts to their consensual creditors. The Murrins' obstruction, evasion, and obdurate resistance to making the petitioning creditors whole on the attorney-fee award, contempt sanctions, and award of costs and disbursements are conclusive evidence that both of the Murrins were not generally paying their debts when due, when the involuntary petitions were filed against them.

The petitioning creditors have satisfied § 303(h)(1). There is a basis for ordering relief under Chapter 7 against the Murrins.

3. *Venue of the Cases, After Entry of Orders for Relief: 28 U.S.C. § 1408.*

Under the applicable venue rule,

> ... a case under title 11 may be commenced in the district court for the district—
>
> (1) in which the domicile, residence, principal place of business in the United States, or principal assets in the

---

**35.** The Murrins acknowledge that they had to borrow at least $20,000.00 from John Murrin's mother to cure delinquencies on mortgage payments for the rental properties in Duluth. John Murrin attributed the default to interrupted cash flow caused by one of the petitioning creditor's levies on bank accounts or tenants. But, it is clear from the record that the total of all such garnishments was only a minority fraction of $20,000.00. Devonna Murrin blithely but summarily attributed any delinquency to error on the part of a mortgage lender or lenders, not to garnishment on tenants. Beyond that, there is a third category of long-overdue creditor claims, albeit another one that the Murrins furiously oppose. Christopher LaNave, the lawyer who took up Devonna Murrin as a client in the Hennepin County litigation, did address a claim against the Murrins, for attorney fees of over $280,000.00. In his testimo-

ny, John Murrin vehemently denied any liability at all on this debt. He acknowledged that LaNave "is due hundreds of thousands of dollars, but not by me." But then he delivered a diatribe about how the fee arrangement was to be on a contingency basis, under which LaNave "wouldn't get paid anything at all if there was no recovery for any new money" from the remaining defendants. Much of this was not too comprehensible. Perhaps there is a bona fide dispute over this debt, despite the reasonable expectation that an attorney-advocate and an attorney-client would have nailed down the terms before the engagement began—like rules of professional responsibility probably dictated. The fact remains that the Murrins are not paying LaNave a thing, and the wrangle is a further indication of chaos in the Murrins' finances and lives. In the end, the petitioning creditors do not need his claim in the calculus of unsatisfied debt.

United States, of the person or entity that is the subject of such case have been located for the one hundred and eighty days immediately preceding such commencement, or for a longer portion of such one-hundred-and-eighty-day period than the domicile, residence, or principal place of business, in the United States, or principal assets in the United States, of such person were located in any other district . . .

28 U.S.C. § 1408.

Throughout these cases, the Murrins have insisted that the petitioning creditors were wrong to file their involuntary petitions in the District of Minnesota, and that proper venue over any bankruptcy case lay only in the Central District of California. At various points, the Murrins' attorney seemed to advocate for denial of bankruptcy relief and/or dismissal of the petitions, on the ground of improper venue. His last submissions backed off a bit on the nature of a judicial remedy to address the asserted impropriety of venue, toward urging a

change of venue were relief ordered against one or both of the Murrins. This was only prudent.[36]

The statute provides four separate bases for the venue of a bankruptcy case, all with reference to the debtor: (1) domicile; (2) residence; (3) location of principal place of business; and (4) location of principal assets. *In re Broady,* 247 B.R. 470, 473 (8th Cir. BAP 2000). The Murrins maintain that none of these alternatives is satisfied as to the District of Minnesota, as to either of them, and that therefore a bankruptcy case for either of them would not belong in Minnesota. They do not deny that they had a decades-long presence in Minnesota and ties with the forum before 2008, particularly with the Twin Cities metro area. However, they insist, a personal relocation to the Los Angeles area of California in 2006 terminated those ties for the purposes of the venue of a bankruptcy case— or at least that any remaining ties they have to Minnesota were subordinated below the level of being "principal."

The fact content of the record is not consistent as to any of the alternatives, so the discussion has to be more detailed.[37]

---

**36.** It is true that a bankruptcy court may dismiss an improperly-venued case, rather than transfer venue to an appropriate forum court. *E.g., In re Wilson,* 284 B.R. 109 (8th Cir. BAP 2002) (though bankruptcy court may raise issue of venue *sua sponte,* in a voluntary case it must give debtor opportunity to argue for transfer of venue as opposed to dismissal). *See also Thompson v. Greenwood,* 507 F.3d 416 (6th Cir.2007) (recognizing availability of both options on ruling that initial venue was improper). (This reference to *Thompson v. Greenwood* is not to be taken as an endorsement of its holding, that the venue issue in an improperly-venued bankruptcy case is governed by 28 U.S.C. § 1406, the general federal venue statute, rather than 28 U.S.C. §§ 1408 and 1412, the bankruptcy-specific venue statutes.) However, at its heart venue speaks to an appropriate, geographically-identified *forum* for the effective administration of the bankruptcy process, not to the substantive propriety of initiating that process in the first place. So, where the according of

bankruptcy relief is substantively merited, and particularly where the timing of the commencement materially affects the estate's options and prospects for avoidance remedies, the more preferable alternative is a transfer of venue rather than dismissal by the improper forum.

**37.** It has to be said: in a case where none of the three large issues is 100% clear-cut, the matter of venue is the most messy. However, it also must be emphasized that the messiness is entirely a product of the way the Murrins carried on their lives and personal and business affairs, and the fact that the Murrins made changes in their lives even as they were entangling the petitioning creditors and others in massive litigation in a Minnesota forum. The record cannot support a finding that the Murrins' relocation was pretextual, or that it was directly prompted by their changing fortunes in the litigation. However, the Murrins are trying far too hard to exploit the coincidence in time of the relocation with the events that ultimately led to these cases.

There are complications both in finding the facts and in applying the law; and many of those are really of the Murrins' making, coming from John Murrin's tendency to heavily qualify any statement of fact, in an excessively-lawyerly way, where the fact would bear on the ultimate legal conclusion.

■■■■■ As to *domicile,* the legal governance of the issue in the context of bankruptcy is a matter of federal rather than state law. *In re Donald,* 328 B.R. 192, 200–202 (9th Cir. BAP 2005) (analyzing legal governance for domicile in bankruptcy according to standards set forth in *Mississippi Band of Choctaw Indians v. Holyfield,* 490 U.S. 30, 109 S.Ct. 1597, 104 L.Ed.2d 29 (1989)). *See also* RESTATEMENT (SECOND) OF CONFLICTS OF LAW § 13 (1971). ("[T]he forum determines domicile according to its own standards."). Domicile is generally defined as "one's permanent home, where one resides with the intention to remain or to which one intends to return." *Id.* at 202 (citing *Williamson v. Osenton,* 232 U.S. 619, 625, 34 S.Ct. 442, 58 L.Ed. 758 (1914)). Every person has one domicile at a time, but not more than one. RESTATEMENT (SECOND) OF CONFLICTS OF LAW § 11 (1971). Once established, domicile continues until superseded by another domicile. RESTATEMENT (SECOND) OF CONFLICTS OF LAW § 19 (1971). Domicile and residence are not synonymous terms; a person can reside in one place while being domiciled in a different place. *Holyfield,* 490 U.S. at 48, 109 S.Ct. 1597.

[18–20] To establish a new domicile, a person must have a physical presence in a new place, coupled with the intention to *remain* there. *Id.* (citing *Texas v. Florida,* 306 U.S. 398, 424, 59 S.Ct. 563, 83 L.Ed. 817 (1939)). In common experience, one may physically relocate on a motivation that is less likely to involve the permanence that a change of domicile requires: business duties; travel or vacation; situs-

dependent artistic or creative endeavor; health-related or medical benefit; or a legal advantage from a presence elsewhere. To make a finding on intent for domicile purposes, a court may consider circumstantial evidence in various external manifestations: the local taxing authorities to which the person responds or defers; ownership of local real estate and presence of personalty; the forum-issuer of the person's driver's license or other permit; the location of financial institutions at which personal banking is done; membership in local clubs or churches; and the establishment of fixed locations for business or employment. The person's statements of intention are also relevant. *Coury v. Prot,* 85 F.3d 244, 251 (5th Cir.1996). Personal declarations of intention must be scrutinized for credibility, and they are to be assigned the same weight as any other statement that may be self-serving. *Welsh v. Am. Sur. Co. of N.Y.,* 186 F.2d 16, 18 (5th Cir.1951).

■■■■ As to married couples, the modern approach is to eschew the deeming of a domicile to one spouse solely from the established domicile of the other. RESTATEMENT (SECOND) OF CONFLICTS OF LAW § 21 (1971). However, the law recognizes the fact that husbands and wives now generally make joint decisions about where to live permanently, and it also acknowledges that there are still legal "advantages of having a single law govern the interests of each member of the family unit." *Id.* cmt. a. Thus, a husband and wife who live together in one place generally are deemed to have the same domicile unless special circumstances would make such a holding unreasonable. *Id.* Generally, those circumstances should be sufficient to support a separate domicile on the general rules, i.e., "closer ties with some other state than with the state of the [spouse's] domicile,"

coupled with a "regard [for] this other state as . . . home." *Id.* cmt. b.

■ *In application,* the facts start with the Murrins' concession that their domicile was Minnesota until at least February, 2006. From then, they lived in California for part of the year and in Minnesota for the rest, until March, 2009. At that time, they started maintaining everyday living in California, on an open-ended basis. Before this court, they cited the need to provide personal care to John Murrin's mother, 86 years old in 2009, as the reason for the change. The question is whether that transition was a legal cleaving line toward the Murrins establishing a domicile in California, or whether they are to be deemed as retaining their long-duration domicile in Minnesota.

As a starting point, the de facto reason that the Murrins give for the change in March, 2009 is not invariably linked with an intent to remain in the new location permanently.[38] And, in any event, a filial wish to provide elder care oneself stems from circumstances that are temporary in nature, whether long or short in duration. After all, elders may end up needing more structured residential care by a third-party provider later, or may pass away. It does not follow with the force of a presumption that a relocated son or daughter would stay where the parent had been living, particularly after the death of the parent.

There is no direct proof that the Murrins relocated to California with the intent to return to Minnesota after the ostensible need would pass; but the facts of their relocation are not necessarily inconsistent with such an intention. The remaining circumstances are a mixture that does not push a conclusion toward either end, with overwhelming force. The objective indicia split between both states as domicile. In the end, the deciding factor is a series of statements that John Murrin made under oath in the Hennepin County District Court lawsuit. Those declarations preponderate with the other evidence to require a finding that he never formed a subjective intention to remain in California permanently, and neither did his wife.

To review all of those factors: to bolster their claim to domicile in California, the Murrins cite their payment of state income taxes and registration to vote there; their possession of driver's licenses and vehicle registration from California; and their receipt of personal mail via the United States Postal Service at an address in California.

However, John Murrin continues to maintain significant professionally-oriented contacts with Minnesota that are consistent with a residual intention to return. He retained his license to practice law in Minnesota and is on active status. He maintains a mailing address for law practice in Madison, Minnesota, the town in the southwestern part of the state where his paralegal now resides.[39] In testimony he termed this a "letterhead office," whatever that means; but he acknowledged receiving mail there and paying the paralegal for what she handled for him at that address. He acknowledged taking "cases [for clients] here [i.e., in Minnesota] on occasion" since early 2009.

The Murrins retain significant ties to Minnesota via their personal maintenance

---

**38.** The rapid flux in the demographics of aging in the United States, coupled with the generational geographic mobility of recent decades, are prompting a wide variety of practical responses when middle-aged persons confront their aged parents' senescence.

**39.** He employed this person at his Twin Cities-based office and he still uses her for local services.

of assets and business investments here, as well. They did not sell their homestead in Minnesota, and continued to rent it to residential tenants. They have kept personalty in storage lockers in Minnesota. Significantly, they continued to own investment real estate in Minnesota and to parlay it to generate income after the ostensible relocation in 2006; they even purchased two more properties in Duluth in mid–2008 as part of a 1031 exchange.

The Murrins' submission to various aspects of California's legal regulation of its inhabitants could support a finding of domicile there. However, it is not inconsistent with a plan to stay there as long as family obligations dictated, and no longer. Neither of the Murrins relinquished the Minnesota-based means through which they had generated personal income before 2006. The first such were John Murrin's professional credentials and at least a nominal presence in law practice.[40] The other such were significant real estate assets that require sustained local maintenance to preserve their value and that generated significant net income for them.

In sum, those externalities are in balance, as reflections of the Murrins' intent on their domicile—even if construed most favorably to them. The factor that tips the analysis is prominent by its absence: credible, preponderant evidence of a specific intent to permanently remain in California, and to abandon Minnesota as a domicile. In 2009—several years into the Murrins' ostensible sojourn in California— John Murrin equivocated several times, under oath or in representations to a judge, as to the location of his residence.[41] These statements were made *after* the date on which the Murrins allegedly decided to stay in California, per their testimony *now*. In his testimony in this court, John Murrin stated that "before the involuntary petition," he had "decided to permanently reside" with his mother in California, and that he had "always intended to stay there." These pronouncements were that firm, but they were also that sparse and shallow.

When presented with the past equivocation versus the facial firmness of the present statement, the Murrins offered a rationalization: the statements in the HCDC litigation were made in an effort to avoid being "hometowned" under any prejudice that a Minnesota court might harbor against a resident of California. This excuse is squalid in its weakness.[42] If anything, the argument reveals just how elastic John Murrin can be; there is a stark

**40.** Before this court, John Murrin testified that he used his Madison, Minnesota "letterhead office" to mitigate the time element for receiving communications via the U.S. Postal Service (claiming it otherwise took four days for the transmission of postal mail between Minnesota and California), and because it "gives [him] the appearance of being in the state" of Minnesota. In its contrived stretch, the latter utterance says far more about John Murrin's attitude toward the malleability of substance and form than it does about his intentions on domicile.

**41.** Dep. of John Murrin (June 17, 2009) [Petitioning Creditors' Exh. 14], Tr. at 5:9–19 (stating that his California address was a "present," rather than "permanent" address;

stating that he had not yet decided where his homestead was, and that his decision "would depend[] on how this case goes") and 9d:3–10 (declining to unequivocally declare that he was a legal resident of California); HCDC Tr. of February 27, 2009 hearing [Petitioning Creditors' Exh. 40] at 62 (in response to presiding judge's question, stating "uh, I am not necessarily uh, I haven't decided where my permanent residence is, I have a residence in California during the winter months").

**42.** It ignores the context—a lawsuit that had already been terminated adversely to the Murrins on its merits without submission to a jury, and a post-judgment hearing before a judge who must be fully accorded the presumption of following his oath of impartiality.

786

contrast to the resolve both he and his wife projected in his testimony here.

It is not necessary to determine which of these variant narratives is the truth, or even to fix their relative degree of self-service. Their lack of consistency is situationally-driven, and that is the salient point. A straight line of represented intent to change domicile, communicated over the two-year span of court proceedings from 2009 to 2010, could anchor the case for an intent to change domicile. A convincing show of intention that had changed at some point, after the Murrins had spent several years in California, would be almost as good. The fact-directed content of the evidence here has neither. And the Murrins' courtroom demeanor shifted too much.[43] Neither of the Murrins' testimony had sufficient credibility, either internally or externally. And there is no other proof, past or contemporaneous, that memorialized an intent on John Murrin's part to change his domicile to California.

So, given the law's presumption that domicile in one forum persists absent a fixed intent to change it, John Murrin must be found to have been a domiciliary of the District of Minnesota when the involuntary petition against him was filed.

■ The analysis as to Devonna Murrin has to be a bit different. In the end, the factors support the finding that she has shared a domicile with her husband throughout the events, and through the filing of the involuntary petition against her.

The objective criteria for Devonna Murrin are mainly the same as for her husband. The only exceptions are a licensure to practice law and the maintenance of a professionally-related presence, neither of which she had. It is quite significant that

she was and is the co-owner of the rental properties in Duluth; and as between the Murrins Devonna purported to be the one more engaged in managing them for income generation. Yes, the Murrins have used an individual property manager local to Duluth to meet the functional day-to-day duties of a landlord, from 2006–on. But, the testimony established that Devonna Murrin has always had extensive ongoing contact with that person, for reports and instruction, and she has managed all of the finances for the properties, receiving and paying out the money. And—crucially for the Murrins' ties to these pieces of Minnesota soil—the Murrins have consistently claimed a set of income tax deductions associated with the ownership of income-generating realty that are available only to those who "actively" manage the property.

In this court, Devonna Murrin testified to having moved to California with the intent to remain there permanently, due to a circulatory condition that made it more difficult for her to be in a cold-climate winter. However, without a showing of prior consistent statements or testimony to that effect, and without hard corroborating evidence of the asserted medical impairment, this statement does not have enough credibility to preponderate.

With this alignment of circumstances, the RESTATEMENT's presumption is especially appropriate. The Murrins never identified special circumstances that would make unreasonable a finding that Devonna Murrin has shared her husband's domicile throughout. This seems to be a marriage of two strong and assertive individuals, who certainly manifested loyalty to one another during their court appearances. If anything, the stated motivation for relocating when they did has less to do with

43. By turns, John Murrin in particular was confrontive, manipulative, reticent, and ostensibly unknowing or forgetful of many crucial details.

Devonna Murrin—it was John's mother who required the care—and there is nothing in the record to suggest that she would not consider returning to Minnesota were those obligations to end.

Devonna Murrin's domicile for her bankruptcy case must be fixed as the District of Minnesota as well. Thus, there is proper venue in this district for both of these cases, under domicile considerations.

**Principal place of business** as a basis for venue in bankruptcy is similarly controlled by federal law. However, under 28 U.S.C. § 1408(1) the rule of decision should be resonant to the particular needs of the bankruptcy process.[44] In that light, a debtor's principal place of business would most appropriately be that place where the debtor has engaged in positive economic activity that creates the debt obligations that would be dealt with in bankruptcy.[45] By logical extension, the referent "business" should not be an entity in which the debtor is a passive investor with limited liability; the debtor would not incur direct obligations through such a passive status. The concept is more appropriately matched to business activity conducted by a debtor as a direct owner, incurring direct liabilities.

*In application*, one can first eliminate the Murrins' ownership of interests in oil and gas production and in entities that hold real estate outside of the state of Minnesota as the "business" for which the principal place would establish venue for these cases.[46] The ownership structures for these investments do not result in the Murrins' incurring debt as primary obligors. Both of the Murrins attested to spending considerable time monitoring and managing these holdings as investments, particularly the oil and gas interests; but this is far more akin to the management of a portfolio of stocks and bonds, something that any investor can do almost anywhere, and at different locations in turn. The oversight, direction, and trading in such intangibles does not

---

44. Case law contains considerable development of the concept of principal place of business for federal diversity jurisdiction under 28 U.S.C. § 1332(c). However, that jurisprudence is generally structured in mind of corporate parties; and it is specifically directed toward opening a federal forum "to those who might otherwise suffer from local prejudice against out-of-state parties" in a state court. *Hertz Corp. v. Friend,* — U.S. —, 130 S.Ct. 1181, 1188, 175 L.Ed.2d 1029 (2010). One court has incorporated the "nerve center" test from the diversity-jurisdiction context into bankruptcy venue considerations, but it erred in doing so. *See In re LaGuardia Assoc., LP,* 316 B.R. 832 (Bankr. E.D.Pa.2004). The key considerations in bankruptcy cases are the convenience of all the parties—both debtors and creditors—and fairness considering how and where the obligations arose. *See* 28 U.S.C. § 1412 ("A district court may transfer a case or proceeding under title 11 to a district court for another district, in the interest of justice or for the convenience of the parties . . ."); *In re Lipphart,* 201 F. 103, 105 (S.D.N.Y.1912) (Con-

gress intended that bankruptcy "proceedings should, as far as practical, be carried on in the jurisdiction most convenient to all concerned"); *In re Iroquois Energy Mgmt., LLC,* 284 B.R. 28, 32 (Bankr.W.D.N.Y.2002) (determining location of principal place of assets for venue purposes by origin of creditor's security interests in contacts with the debtor's domicile or principal place of business; such contacts evidence parties' expectation as to situs of adjudication as to any dispute over perfection of lien).

45. It is well recognized that a debtor's principal place of business is not the place of the debtor's employment by a third party. *Barnes v. Whelan,* 689 F.2d 193, 203–205 (D.C.Cir. 1982); *In re Lipphart,* 201 F. at 105.

46. Through LLCs or other artificial entities, the Murrins hold partial interests in real estate in Ohio (a multi-tenant commercial property) and in Davenport, Iowa (a single-tenant office building, apparently the corporate headquarters of the Sentry Insurance Company).

really have a situs. This is undeniable in the early 21st century, given how the financial and commodities markets are now parlayed almost entirely by remote means, on-line or by telecommunication.

This leaves the three other vehicles through which the Murrins say they have derived income, or did when these cases were commenced. Devonna Murrin testified to having a small firm for securities trading. When she was deposed in June, 2009, she testified to not having worked as a securities broker for the preceding seven months. This is not consistent with the reportage on her income tax returns for 2008 and 2009; the 2009 return shows total business expenses of $36,362.00 and a net loss of $12,230.00.

On the same returns, John Murrin reported total expenses related to his law practice of $92,207.00 and a net loss of $71,861.00 for 2008. For 2009, his reported expenses were $45,236.00 and his reported net loss was $12,908.00.

The disclosure of these figures is the only evidence that relates to the depth and breadth of the Murrins' business activity that could be characterized as sited in California, and through which they could establish debtor-creditor relationships. The disclosures establish gross revenue for each of them from business activity that varies from about $30,000.00 to $100,000.00 annually, for 2008–2009. Not even all of this is derived from activity in California, given John Murrin's continuing law-practice presence in Minnesota. In any event, this pales in comparison to their business as residential landlords in Duluth. For the ten properties there, they incurred approximately $1,490,000.00 of secured debt; and they generate approximately $240,000.00 per year in gross rents, as well as the ongoing expenses (maintenance, property taxes, insurance, and the employment of local management). The presence in Minnesota of these hard assets of sub-stantial value, exploited in a management-intensive business operation, establishes a place of business in Minnesota that is significantly greater in proportion and magnitude than anything sited in California from which the Murrins derive income. Their principal place of business is in the District of Minnesota, and the venue of their bankruptcy cases properly lies here on this consideration as well.

■ **Location of Principal Assets in the United States** is a third basis for venue under 28 U.S.C. § 1408(1). Logically, this provision should be construed in a way most resonant with the *functional* concerns of the administration of the bankruptcy estate; all assets in question will be administered by a trustee serving under the jurisdiction of the forum court. Next, it should be parsed in mind of the interests of secured creditors that would hold liens against those assets; those constituencies would be best-served by a forum court most conversant with the law that governs their rights.

■ In particular, the identification of those assets that are "principal" should be made with the former in mind. On that consideration, more emphasis should be put on tangible assets, particularly immovables like real estate. In a post-industrial economy, the form of so much wealth is intangible; and the instrumentalities through which such assets are obtained, transferred, and manipulated are almost completely independent of physical presence. But, for the hands-on sale of income-generating real estate, physical plant, machinery, equipment, and the like, the advantage for an administering trustee lies in physical proximity to the asset. Physical inspection is more convenient; preexisting ties to knowledgeable local professionals, agents, and property managers can be used more quickly; and a trustee's conversance with local markets and

local legal governance will enable more adept and reliable administrative decisions to be made more quickly.

 *In application,* with greater weight assigned to such functional considerations, the "principal" assets of the Murrins that would direct the outcome on venue of that sort would be the ten rental properties in Duluth. To be sure, there is the partial ownership interest in the Sentinel building in Iowa, and that in the Ohio-sited office building. And, yes, the Murrins hold partial interests in investment vehicles that are engaged in oil and gas extraction, which obviously are outside the state of Minnesota. Neither of those requires an owner's presence in the state of situs of the underlying realty, in order to manage the interest during ownership or to market it for sale. The historical fact of the Murrins' admitted success in parlaying their ownership to profit at distances from Minnesota and California establishes that, without credible challenge.

So, venue in Minnesota as the situs of the Murrins' principal assets is also appropriate.

*Residence* is the only basis for venue that could conceivably be given to the Murrins, given their maintenance of physical residential accommodations in California at the date of the commencement of these cases and for the 180 days preceding.

However, because the statutory bases of 28 U.S.C. § 1408(1) are phrased in the alternative, venue is established on the satisfaction of any one of them. *In re Broady,* 247 B.R. at 473. Here, three are met; so the venue of these cases in the district of their origin is proper, and this court is where they will proceed.

## OUTCOME

On the memorandum of decision just made,

IT IS HEREBY DETERMINED AND ORDERED:

1. There is a basis under 11 U.S.C. § 303(h) for ordering relief under Chapter 7, as to the debtors in both of these cases.

2. That relief will be granted via separate orders in each case, in standard form.

3. The Debtors' request for a change of the venue of these cases is denied.